

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| TEXAS DEPARTMENT OF STATE HEALTH SERVICES, | § | No. 08-19-00273-CV |
| | § | |
| Appellant, | § | Appeal from the |
| | § | |
| v. | § | 168th Judicial District Court |
| | § | of El Paso, Texas |
| GUSTAVO RESENDIZ, | § | |
| | § | (TC #320710168) |
| Appellee. | § | |

## **O P I N I O N**

Appellee Gustavo Resendiz was terminated in February of 2014 from his position as a Maintenance Specialist at the El Paso Psychiatric Center (the Center) for allegedly stealing state property.   He then sued Appellant Texas Department of State Health Services (the Department), the agency currently responsible for overseeing the Center, raising claims of gender, national origin, and disability discrimination, in addition to retaliation and sexual harassment.

The Department filed a plea to the jurisdiction, challenging with evidence several elements of Resendiz's claims.   The trial court denied the plea in its entirety   For the reasons set forth below, we agree with the Department that Resendiz failed to establish a prima facie case of gender discrimination and retaliation.   And even assuming Resendiz presented a prima facie case for

these, and his other claims, he failed to sufficiently rebut the Department's evidence that he was terminated based on its belief that he committed theft. This failure negates his gender, national origin, disability discrimination, and retaliation theories. We further conclude that while he lacks evidence to support a *quid pro quo* sexual harassment claim, he does have sufficient evidence to support his claim for sexual harassment based on a hostile work environment. We therefore reverse in part and affirm in part the trial court's judgment.

## I. FACTUAL BACKGROUND

### A. The Alleged Theft

The Center is a state hospital that provides psychiatric services to citizens of Texas. Resendiz was hired to work at the Center in November of 2002 as a Maintenance Specialist IV under the supervision of Josefina Herrera, the Center's Support Services Director. Resendiz's job responsibilities included construction and general maintenance work, and as such, he had access to all areas of the Center, including the loading dock and supply room.

On January 20, 2014, Herrera and her administrative assistant, Lazaro Sanchez, reviewed video footage of the loading dock area which showed Edgar Garcia, Resendiz's co-worker, take a roll of vinyl flooring from a storage area behind the loading dock, place it on a dolly, roll it outside, and leave it near a large dumpster. Shortly thereafter, Resendiz can be seen exiting through the loading dock carrying what appeared to be a bucket of flooring adhesive, and walking in the general direction of the same dumpster. Resendiz is then seen walking back to the loading dock empty-handed. There is nothing in the video to indicate that either of the two items were ever returned to the loading dock, and a subsequent inventory review revealed that a roll of vinyl flooring valued at $1,596 and a 5-gallon bucket of flooring adhesive valued at $37.40 were missing. In addition, a car was later seen entering the loading dock area and momentarily parking

2

near the dumpster area where the supplies had been left; the ownership of the car was never established.

According to Herrera, after confirming that the vinyl flooring was missing, she confronted Garcia, who advised her that he thought he had brought the vinyl back to the loading dock. She did not, however, initially realize that the adhesive was missing, and therefore did not question Resendiz about that item. Herrera then consulted with her then-supervisor, David Osterhout, and the matter was referred to the Texas Office of Inspector General (OIG) to investigate whether Garcia and Resendiz had stolen the missing property. Although the investigator believed that the two men may have been working together, he conducted separate investigations to determine whether Garcia had stolen the vinyl flooring and whether Resendiz had stolen the bucket of adhesive. The investigator reviewed the video footage, the inventory receipts, and spoke with various witnesses, including Resendiz, who denied taking the adhesive from the loading dock, and further denied seeing Garcia move the vinyl flooring. Garcia, on the other hand, advised the investigator that he recalled seeing Resendiz take a bucket of adhesive from the loading docket, but did not ask him why he had done so. Garcia claimed that he took the vinyl flooring from the loading dock as it was obstructed the work area, but then forgot to return it to the dock.

After completing his investigation, the investigator issued two separate reports finding that the theft charges against both men were "substantiated." In finding that the charge against Resendiz was substantiated, he noted that it was unclear on the video whether the bucket that Resendiz was seen carrying to the dumpster area was full or not. But given that a similar sized bucket of adhesive was later found to be missing, he deduced that Resendiz had in fact taken the

3

adhesive.[1]    The investigator referred the theft charge against Resendiz to the El Paso City Attorney's office, but that office never brought any charges. The theft charge against Garcia, however, was referred to the El Paso County Attorney's office, and following a jury trial, Garcia was acquitted.

### B.    The Termination

The Center sent Resendiz a "Notice of Possible Disciplinary Action" on February 27, 2017, signed by both Herrera and Osterhout, which notified him that the OIG investigation had substantiated the theft charge, and that this subjected him to possible disciplinary action. Although the notice gave Resendiz the opportunity to provide "rebuttal information," Resendiz declined to do so.   Osterhout notified Resendiz that he was being terminated effective February 28, 2014.

## II.   PROCEDURAL BACKGROUND

Resendiz filed a charge of discrimination with the Texas Workforce Commission Civil Rights Division, alleging discrimination under the Texas Commission Human Rights Act (TCHRA).   After the Workforce Commission issued a right to sue letter, Resendiz filed his lawsuit against the Department, alleging unlawful discrimination based on gender (male), national origin (Mexican), and disability (hypertension).   He further alleged that he was the victim of "unlawful retaliation for engaging in protected activities, and a hostile work environment."   After responding to the suit and engaging in discovery, the Department filed a plea to the jurisdiction, arguing that the jurisdictional evidence did not support a finding that Resendiz had been terminated for any unlawful reason, or that he was the victim of a hostile work environment, and that the true

---

[1] Resendiz later testified during his deposition that the bucket he was seen taking to the dumpster area was empty and that he was disposing of it as trash.

cause of his termination was the theft of the building supplies. The Department therefore claimed that its governmental immunity from suit was not waived, and that the trial court therefore lacked jurisdiction to hear the lawsuit. Resendiz responded, claiming that he had come forward with sufficient jurisdictional evidence to support his claims and to support a waiver of the Department's immunity. Both parties submitted voluminous exhibits in support of their positions.

The trial court denied the plea in its entirety, and the Department filed an appeal from the trial court's order. The Department raises one global issue contending the trial court failed to dismiss each of Resendiz's claims.

### III. APPLICABLE LAW AND STANDARD OF REVIEW

State agencies, such as the Department, are protected by sovereign immunity from lawsuits other than for claims for which their immunity has been waived by the legislature. *Texas Dep't of Aging and Disability Services v. Lagunas*, 546 S.W.3d 239, 246 (Tex.App.--El Paso 2017, no pet.) *citing Texas Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011). Absent a waiver, a governmental unit's sovereign immunity deprives a trial court of subject matter jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *Tirado v. City of El Paso*, 361 S.W.3d 191, 194 (Tex.App.--El Paso 2012, no pet.). The Texas Legislature has, however, created a limited waiver of immunity for discrimination claims brought under the TCHRA. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). That waiver, however, extends "only for those suits where the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder." *Id*.

A governmental entity may challenge the validity of a plaintiff's claim through a plea to the jurisdiction. *Miranda*, 133 S.W.3d at 225-26. A plea may attack the face of the pleading but may also include evidence which thereby places into issue the existence of a jurisdictional fact.

5

*Id.* at 226-27. When, as here, a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider all the relevant evidence submitted by the parties. *Id.* "If there is no question of fact as to the jurisdictional issue, the trial court must rule on the plea to the jurisdiction as a matter of law." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009). On the other hand, if the jurisdictional evidence creates a fact question, then the trial court cannot grant the plea to the jurisdiction, and the issue must be resolved by the fact finder. *Lagunas*, 546 S.W.3d at 246. Our review of the trial court's decision mirrors that of our review of summary judgments, which we review de novo, accepting as true all evidence favorable to the non-movant, and indulging every reasonable inference and resolving any doubts in the non-movant's favor. *Id.*, *citing Miranda*, 133 S.W.3d at 226-27; *State Dep't of Highways and Public Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002).

In determining whether a plaintiff has a valid claim under the TCHRA for either discrimination or unlawful retaliation, Texas courts recognize two alternative methods of proof. *See Williams-Pyro, Inc. v. Barbour*, 408 S.W.3d 467, 477-79 (Tex.App.--El Paso 2013, pet. denied), *citing Mission Consol.*, 372 S.W.3d at 634. First, a plaintiff may prove unlawful discriminatory or retaliatory intent via direct evidence. *Williams-Pyro, Inc.*, 408 S.W.3d at 477-79. "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001). However, as courts have recognized, it is often difficult to prove "forbidden animus" through direct evidence. *Id.* (recognizing that "motives are often more covert than overt, making direct evidence of forbidden animus hard to come by"); *see also Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 782 (Tex. 2018) (recognizing that "smoking guns are hard to come by" in discrimination and unlawful retaliation cases).

6

Because of this, Texas courts have developed a second method of establishing a claim under the TCHRA, which follows the burden-shifting mechanism described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). That paradigm allows the plaintiff to establish a case through circumstantial evidence. *See Alamo Heights*, 544 S.W.3d at 782 (applying *McDonnell Douglas* framework to unlawful retaliation cases). Under this method, commonly referred to as the "*McDonnell Douglas*" framework, the plaintiff must first come forward with sufficient jurisdictional evidence to establish a prima facie case on each element of their claim. *See id*. And if the plaintiff meets this burden, discrimination is presumed, and the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Madden v. El Paso Indep. Sch. Dist.*, 473 S.W.3d 355, 360 (Tex.App.--El Paso 2015, no pet.), *quoting Quantum Chem. Corp.*, 47 S.W.3d at 477. Once an employer offers an ostensibly legitimate reason for their actions, the presumption disappears, and "[t]he burden then shifts back to the complainant to show that the employer's stated reason was a pretext for discrimination." *Madden*, 473 S.W.3d at 360, *quoting Quantum Chem. Corp.*, 47 S.W.3d at 477. To establish a fact question on the issue of pretext, the plaintiff must present evidence, which when viewed as a whole, would support a finding that the non-discriminatory reason given by the employer was false or not credible, and that the "real reason for the employment action was unlawful discrimination." *Madden*, 473 S.W.3d at 360-361.

## IV. GENDER DISCRIMINATION

To establish a prima facie case of gender based employment discrimination, Resendiz was required to plead and produce evidence (1) that he was a member of a class protected by the TCHRA, (2) that he was qualified for his employment position, (3) that he was terminated from his employment, and (4) that he was replaced by someone outside his protected class after his

termination. *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (per curiam). To satisfy the fourth prong of the test, an employee may in some instances alternatively establish that he or she was treated differently than similarly situated employees, also referred to as "comparators." *See, e.g.*, *Remaley v. TA Operating LLC*, 561 S.W.3d 675, 681 (Tex.App.--Houston [14th Dist.] 2018, pet. denied) (recognizing that the fourth prong of the test will vary depending on the context of the plaintiff's employment claim); *Acosta v. Gov't Employees Credit Union*, 351 S.W.3d 637, 641 (Tex.App.--El Paso 2011, no pet.) (recognizing that the precise requirements to establish a prima facie case vary depending on the allegations in each case, and in some instances an employee may satisfy the fourth prong by producing evidence that she was treated differently than other similarly-situated employees).

The Department's plea to the jurisdiction attacked Resendiz's gender discrimination claim by first identifying each of the comparators that Resendiz had identified in discovery. The Department then attached an exhibit germane to each of those comparators that challenged whether any of them were ever charged with theft, or had the same chain of command. In that way, it challenged whether any of these employees were in fact true comparators. Additionally, the Department identified the persons who replaced Resendiz, and attached some evidence that each of them were males, which negated that he was replaced with someone outside his protected class.

In his response to the plea below, Resendiz responded to the Department's arguments on national origin, disability discrimination, retaliation, and sexual harassment. He did not, however, make any specific response to the challenge on the gender discrimination claim. On appeal, the Department reasserts its challenge to the gender discrimination claim, again pointing to the evidence that Resendiz was replaced by only males, and the comparators were not really comparators. And again, Resendiz does not address the challenge to the prima facie case on that

8

theory in his brief.[2]   Accordingly, the trial court would have erred in failing to dismiss the gender discrimination claim.   We grant the Department's challenge to the extent it argues that Resendiz fails to make out a prima facie case for gender discrimination.

## V.   THE DEPARTMENT PROFFERED A NON-DISCRIMINATORY REASON FOR HIS TERMINATION, WHICH RESENDIZ DOES NOT REBUT

Resendiz does not argue that he has direct evidence of discrimination for any of his several theories.   As explained above, when a plaintiff is unable to present direct evidence of discrimination, he may instead produce evidence establishing a prima facie case of discrimination under the *McDonnell-Douglas* framework.   To establish a prima facie case of employment discrimination for his national origin claim, Resendiz was required to plead and produce evidence (1) that he was a member of a class protected by the TCHRA, (2) that he was qualified for his employment position, (3) that he was terminated from his employment, and (4) that he was replaced by someone outside his protected class after his termination (or was treated differently than comparators).   *AutoZone, Inc.*, 272 S.W.3d at 592.   Likewise for his disability claim, he must show (1) the plaintiff has a disability, (2) he is qualified for the job, and (3) he suffered an adverse employment decision because of his disability.   *See El Paso County v. Vasquez*, 508 S.W.3d 626, 639 (Tex.App.--El Paso 2016, pet. denied), *citing Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1996) (per curiam).

---

[2] It is unclear whether Resendiz is pursuing a claim of gender discrimination based on the substance of his pleadings and his brief on appeal. To the extent such a claim is made, Resendiz failed to meet his burden of presenting a prima facie case.   In his summary of his argument, Resendiz states that a "reasonable juror could find that Resendiz's *age* was at least a factor in Appellant's action (emphasis supplied)."   However, his pleadings never asserted an age discrimination claim.   And even to the extent that this was a mere typographical error, there is no substantive argument in the brief that responds to the Department's claim that the identified comparators were not really comparators, or that Resendiz was replaced with only other male workers.   *See RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 126 (Tex. 2018) ("A brief must provide citations or argument and analysis for the contentions and failure to do this can result in waiver.").

And assuming that Resendiz met his burden for each of these claims, the Department then carried the burden of production to show a non-discriminatory basis for its decision. *Quantum Chem. Corp.*, 47 S.W.3d at 477. If it does so, Resendiz then must prove that his disability or national origin was a motivating factor in his termination. *See Id*. (once an employer offers an ostensibly legitimate reason for its actions, the presumption of discrimination disappears, and the burden then shifts back to the employee to show that the employer's stated reason was a pretext for discrimination); *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) (causation standard is motivating factor); *Quantum Chem. Corp.*, 47 S.W.3d at 480.

While the Department contests whether Resendiz has met his burden to show a prima facie case for the national origin and disability discrimination, we need not address those arguments. Instead, we conclude that the Department met its burden to demonstrate a non-discriminatory basis for the termination--suspected theft of Department property--and Resendiz was then unable to show that stated reason was a pretext for an discrimination.

### A. The Department's Legitimate, Nondiscriminatory Reason for the Termination

The Department's internal policy expressly states that employee theft is classified as a "major offense," and "most likely will result in dismissal from employment[.]" The Department presented evidence that Josefina Herrera suspected that employees were violating that policy by taking patients' food after she found empty state-purchased juice boxes in the maintenance workshop. To investigate that belief, she looked at video surveillance of the loading dock. Video footage from February 27, 2014, showed Edgar Garcia taking a roll of floor vinyl out of the facility and placing it near a dumpster. It also showed Resendiz take a can of adhesive out the same door towards the dumpster. Later an unidentified car came by the dumpster. Internal inventory records show a missing role of floor vinyl and a missing can of adhesive.

10

The surveillance footage further showed that on the day of the alleged theft, a delivery truck arrived and a large amount of supplies and materials were unloaded and placed next to the loading dock door, including boxes of flooring and seven buckets of flooring adhesive. Both Resendiz and Garcia admitted there was a delivery that day and that they were present at the time of the delivery. Later the same day, Garcia walked into the loading dock with Resendiz behind him. Garcia pressed the button to open the loading dock door and Resendiz walked toward the loading dock door. Resendiz picked up a bucket that was located in the same area where the materials/supplies were delivered and placed earlier that day. Resendiz then exited through the loading dock door towards the direction of the dumpster outside with the bucket in his hand. Resendiz walked back inside without the bucket in hand, and then both he and Garcia left the loading dock area. Frame by frame still shots captured from the same video surveillance were all included as exhibits to the Department's plea.

The Department's plea also documents that Hernandez, upon seeing these images, called in a state investigator who reviewed the surveillance footage, took statements, and reviewed the inventory records. The investigator concluded that the allegations of theft against both Garcia and Resendiz were substantiated, and he referred both matters for criminal prosecution. Information gathered by the OIG investigator is all attached to the Department's plea, and includes interview memorandums with fact witnesses, a case video memorandum, photos, invoices, and video surveillance of the loading dock area of the EPPC where the theft occurred.

On February 27, 2014, Resendiz was served with a notice setting out this allegation along with a warning of the possible consequence of losing his job. The notice provided him an opportunity to respond. He declined, and the Department terminated his employment. This evidence is sufficient to state a non-discriminatory reason for the termination. Resendiz was then

11

tasked with challenging that stated reason by showing it was a pretext for the discriminatory motives that he asserts.

### B. The Department's Reason for Termination was Sufficiently Stated

Resendiz first contends that the Department failed to offer a non-discriminatory basis for its decision, claiming that it only provided vague, "non-specific" reasons for his termination, and that its stated reasons were without any content that would "afford [him] a realistic opportunity to show that the reason is pretextual." Appellee's Brief at 61-62. He further contends that the Department's plea to the jurisdiction merely relied on the "argument of counsel" in articulating its reasons for his termination, and that the Department failed to present any evidence that it terminated him for a legitimate nondiscriminatory reason. We agree with Resendiz that an employer's articulated reasons for the adverse termination decision must be sufficiently specific to give the employee the opportunity to present evidence establishing that the reasons were pretextual. *See, e.g.*, *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) (employer did not meet its burden of articulating a legitimate, nondiscriminatory reason for failing to promote an employee, where it simply stated its opinion that the employee would not "fit in" and was not "sufficiently suited" for the position). We disagree, however, that the Department failed to meet this standard.

The Department clearly and expressly informed Resendiz that he was being terminated for theft of Department property in the termination notice that was sent to him. And, as the Department points out, its policy manual expressly states that theft of property is considered a "major offense," which is a ground for an employee's termination. As well, the commission of a serious offense such as theft, which violates an employer's express policies, can be considered a legitimate, nondiscriminatory reason for an employee's termination. *See, e.g.*, *Jones v. Overnite*

12

*Transp. Co.*, 212 Fed.App'x 268, 274 (5th Cir. 2006) (per curiam) (theft and conversion of company property upheld as legitimate, nondiscriminatory reasons for employee's termination); *Lund v. Texas Health & Human Services Comm'n*, No. 04-17-00625-CV, 2019 WL 1049347, at *2-4 (Tex.App.--San Antonio Mar. 6, 2019, pet. denied) (mem. op.) (employer articulated a legitimate non-discriminatory reason for employee's termination based on an OIG investigation that confirmed employee had violated its policies by, among other things, using a "Lone Star Card" issued to her nephew for her own personal use without authority to do so).

Moreover, in its plea to the jurisdiction, the Department did not just rely on the arguments of its counsel in stating the reason for Resendiz's termination; instead, it attached supporting exhibits, including the termination notice it sent to Resendiz stating that he was being terminated for theft, and the deposition testimony of at least three Department employees who all testified that Resendiz was terminated for theft.

### C. Resendiz Failed to Raise a Fact Question on the Issue of Pretext

Next, Resendiz sets forth multiple reasons why he believes the Department's stated reason for terminating him was false and was a pretext for its alleged discriminatory animus. We address each of his arguments in turn.

First, Resendiz contends that the Department deviated from its usual policies when it terminated him without first engaging in "progressive discipline," and he argues that this alleged deviation can be considered as evidence of pretext. *See Cont'l Coffee Products Co. v. Cazarez*, 937 S.W.2d 444, 451 (Tex. 1996) (treating failure to adhere to established company policies in carrying out a challenged employment action as establishing a causal link between termination and employee's exercise of a protected right). Although in some instances an employer's deviation from its standard policies or procedures in disciplining an employee can be considered evidence

13

of pretext, there is nothing in the record here to suggest that the Department deviated from its standard policies or procedures when it terminated Resendiz. The Department's policy manual clearly states that theft is a "major offense" that is grounds for immediate dismissal, and there is nothing in the manual that would suggest the Department was required to engage in progressive discipline when an employee was accused of such an offense. In addition, at his deposition, Osterhout testified that although the Department may use progressive discipline in less "severe" cases of employee misconduct, the Department has the discretion to "jump" to termination when an employee is accused of a more serious offense such as theft. In fact, Osterhout testified that he had never seen progressive discipline used in cases in which an employee was accused of stealing state resources.

Second, Resendiz finds evidence of pretext based on his contention that the Department treated other employees differently than him in meting out, or failing to mete out discipline. Although discrimination can be found when an employer has treated an employee in a "disparate" manner in comparison to other employees, such a finding is only justified if the employees are similarly situated in all material respects. *See Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917-18 (Tex. 2005) (per curiam). Thus, to establish a discriminatory motive, the employees who were allegedly treated more favorably than the plaintiff must have engaged in misconduct that was "nearly identical" in seriousness to the plaintiff's misconduct. *Id.* Here, Resendiz relies on the fact that the Department did not discipline other Department employees who failed to report that they had observed the missing roll of vinyl left outside the loading dock, as Department policy required them to do. These employees, however, engaged in different misconduct that was of a less serious nature than theft. Moreover, there is nothing in the record to suggest that the Department treated other employees who were accused of theft, or other similarly serious

14

misconduct, more favorably than him. To the contrary, Osterhout testified that other Department employees who had been accused of theft were also terminated and were therefore treated the same as Resendiz.

Third, Resendiz contends that the record contains discrepancies with respect to who were the final decision-makers responsible for terminating him, and he alleges that the Department's Superintendent, Zulema Carrillo, as well as Osterhout, and Herrera all claimed that each other, as well as the Austin headquarters, made the final termination decision, and that none of them was willing to take responsibility for the decision.[3] Such conflicting evidence and blame-shifting could support a finding of pretext. *See, e.g.*, *Frierson v. Illinois Cmty. Coll. Dist.* 525, No. 97 C 6487, 2000 WL 283103, at *5 (N.D. Ill. Mar. 6, 2000) (pretext finding supported by conflicting statements regarding who made the employment decision, and therefore no one who could truly advance the reason for the termination, given that no one claimed responsibility for the action); *Christensen v. Titan Distribution, Inc.*, 481 F.3d 1085, 1095 (8th Cir. 2007) (pretext finding supported in part by evidence that decisionmakers were not willing to accept responsibility for decision, but each blamed others).

However, the record does not support Resendiz's allegations, as there is nothing to suggest that the Department's supervisory employees did not accept responsibility for the termination decision, or that they were attempting to shift blame to each other, or to the Austin headquarters. To the contrary, Carrillo, Herrera, and Osterhout all agreed that Resendiz's termination was made in accordance with the Department's usual multi-step process, which necessarily involved review

---

[3] Resendiz also contends that during their depositions, these three individuals gave differing reasons for his termination   In particular, Resendiz finds it significant that Osterhout testified that Resendiz was terminated based on "suspicion of theft and losing State assets," while Carrillo and Herrera both testified that he was terminated due to theft   However, Osterhout made it clear that he believed Resendiz had committed a theft and had colluded with Garcia in doing so.   We therefore do not find any inconsistencies in the Department's position that Resendiz was terminated for theft.

15

and approval by more than one person and department. As both Herrera and Osterhout testified, after reviewing the video footage pertaining to the missing property, they concluded that Resendiz was responsible for theft of state property and referred the matter to the OIG. And, after being informed that the OIG had substantiated that criminal activity had occurred, Osterhout recommended Resendiz's termination, and as required by Department policy, that recommendation was reviewed by both Carrillo, as the Center's superintendent, as well as by the legal department at the Austin headquarters.[4] And in turn, there is no dispute that after obtaining approval from both Carrillo and the legal department, both Osterhout and Herrera signed the final termination notice, and accepted full responsibility for doing so.

Fourth, Resendiz seeks to establish pretext by arguing that the termination notice itself contained "false" information. In particular, Resendiz finds it significant that the termination notice stated that the "[a]fter reviewing the recordings and conducting interviews, the OIG investigator decided to proceed with filing theft charges for a roll of vinyl and a can of adhesive valued at over $1,500." Resendiz points out that the OIG investigator did not make his final recommendation until March of 2014, yet the termination notice referring to the OIG's findings was dated February 28, 2014. Resendiz further contends that when the Department made the decision to terminate him, "Osterhout, Carrillo, and Herrera did not know what any witnesses saw, what evidence there was that Resendiz committed theft, or what OIG had found." Appellee's Brief at p. 68. This, however, is not an accurate summary of the facts.

---

[4] Contrary to Resendiz's argument, none of the employees involved attempted to shift any blame to the Austin Headquarters' office for making the final termination decision, as they made it clear in their deposition testimony that the termination recommendation was sent to the legal department for review and guidance only. In addition, although Osterhout testified that he believed Carrillo was a final decision-maker, it is unclear whether he meant that she had veto power over the final decision, or whether she was in fact considered a true decision-maker.

As the Department points out, the OIG investigator informed both Carrillo and Osterhout by e-mail dated February 19, 2014, that he had completed his preliminary interviews with respect to the theft allegation against Resendiz, and that he had found "evidence of criminal activity," and that the Department could address Resendiz's employment status at its discretion. In addition, Osterhout testified that prior to sending the termination notice, he had a verbal conversation with the OIG investigator in which the investigator told him that he intended to file charges against Resendiz "for theft for over $1,500." Therefore, although admittedly none of the individuals involved had received an actual copy of the OIG's report at the time the termination decision was made, the record clearly indicates that the Department was aware of the investigator's preliminary findings at the time of the termination. [5] And, as the Department points out, there is nothing in the record to suggest that the Department was required to wait until the OIG issued its final report before it could terminate Resendiz, or that it was even required to submit the matter to the OIG before making the termination decision. Moreover, both Osterhout and Herrera had reviewed the video footage related to the alleged theft before the OIG investigation began, and they had both independently concluded that Resendiz has stolen State property.

Fifth, Resendiz contends that the video could not have been made on January 17, 2014. At his deposition, however, Resendiz was shown the video, and although he disputed the accuracy of the time on the video, he did not dispute that the video showed what it showed. That is, he acknowledged the video showed the loading dock area, that there a large delivery of supplies that

---

[5] Resendiz also finds it significant that in the termination notice, the Department stated that the OIG had investigated him for stealing both the vinyl and the adhesive, when in fact the OIG had only investigated him for stealing the adhesive. However, at the time the termination notice was sent, Osterhout was unaware that the investigator was only investigating Resendiz for stealing the adhesive and not the vinyl and Osterhout himself believed based on his own review of the evidence that Resendiz had colluded with Garcia to steal both items.

17

day, that Garcia removed the roll of vinyl out the back door, and that he is shown removing a container of adhesive out the back door.

Sixth and finally, Resendiz contends that the Department and the OIG investigator did not conduct a "thorough investigation" of the theft allegations, contending that they failed to verify certain details regarding the theft and failed to conduct a formal inventory of missing items after the alleged theft took place. Even if there were errors in the investigation, or it was not as thorough as Resendiz would have liked, this does not, standing alone, establish that the Department's reasons for terminating him were pretextual. *See Davis v. Farmers Ins. Exch.*, No. 4:08-CV-625-A, 2009 WL 1065159, at \*7 (N.D. Tex. 2009), *aff'd*, 372 Fed.App'x 517 (5th Cir. 2010) (contention that employer did not conduct a sufficiently thorough investigation into allegation that employee took gifts from employer's vendors in violation of employer's policy did not support a finding of pretext). In determining whether an employer's stated reasons for an adverse termination decision were pretextual, the focus is not on whether the decision itself was error-free, but on whether the employer relied on its stated reasons, in good faith, in making the employment decision. *See Waggoner v. City of Garland, Texas*, 987 F.2d 1160, 1165-66 (5th Cir. 1993) (the focus is on whether the employer's perceptions--whether accurate or not--were the real reason for the adverse action rather than a pretext to cover up its discriminatory animus); *see also Alamo Heights*, 544 S.W.3d at 792 (recognizing that the issue is "whether the employer's perception of the [employee's] problems--accurate or not--was the real reason for termination.").

Accordingly, we conclude, even if we assume Resendiz met his prima facie burden for national origin discrimination, or that he evidenced a disability under the TCHRA, or even made out a valid gender discrimination claim, the Department set forth a legitimate, non-discriminatory reason for Resendiz's termination, and Resendiz failed to present any evidence that the Department

18

was not acting in good faith in relying on that reason. We therefore conclude that Resendiz has failed to raise a fact question on the issue of pretext.

The Department's Issue as it pertains to the national origin, and disability claim is sustained.

## VI. RETALIATION

Resendiz concedes that he has no direct evidence that the Center had a retaliatory motive for terminating him, and therefore, our question whether he has come forward with sufficient evidence to support a prima facie case of retaliation under TCHRA, in accordance with the *McDonnel-Douglas* burden shifting framework set forth above. For the reasons set forth below, we conclude that he has not met this burden.

### A   The Elements of a Retaliation Claim

The THCRA prohibits an employer from engaging in retaliation against an employee for opposing a discriminatory practice.[6] *See Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804, (Tex. 2010), *citing* TEX.LAB.CODE ANN. § 21.051, .055(1); *see also County of El Paso v. Aguilar*, 600 S.W.3d 62, 82-83 (Tex.App.--El Paso 2020, no pet.) ("The TCHRA prohibits an employer from retaliating against an employee for engaging in protected activity such as opposing a discriminatory practice or making a charge of discrimination."). "To establish a prima facie case of retaliation, an employee must show: (1) [he] engaged in an activity protected by the TCHRA, (2) [he] experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse action." *Texas Dep't of Transp. v. Lara*, 625 S.W.3d 46,

---

[6] "An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter: (1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." TEX.LAB.CODE ANN. § 21.055. Resendiz only claims that he opposed a discriminatory practice and does not claim that he filed a charge or complaint against Herrera or that he testified or participated in any proceedings against her prior to his termination.

58 (Tex. 2021), *quoting Alamo Heights*, 544 S.W.3d at 782.   A retaliation claim is related to, but distinct from, a discrimination claim, and one may be viable even when the other is not.   *Alamo Heights*, 544 S.W.3d at 763-64, 781. Unlike a discrimination claim, a retaliation claim focuses on the employer's response to an employee's protected activity, such as making a discrimination complaint, rather than on the validity of the underlying discrimination complaint.   *Id.*   Thus, the plaintiff need not establish that the reported discrimination occurred to support a claim for retaliation and need only establish that he had a good faith and reasonable belief that the discrimination occurred when he made his report.   *See Houston Methodist San Jacinto Hosp. v. Ford*, 483 S.W.3d 588, 592 (Tex.App.--Houston [14th Dist.] 2015, pet. denied) (employee has the burden to "demonstrate a good-faith, *reasonable* belief that the underlying discriminatory practice violated the TCHRA.").   In other words, "[o]pposition to a discriminatory practice is a protected activity irrespective of the merits of the underlying discrimination claim."   *City of Waco v. Lopez*, 259 S.W.3d 147, 151 (Tex. 2008).

### B.   Whether Resendiz Engaged in Protected Activity

Resendiz's termination is an adverse employment decision, but what is missing from the record is any evidence that he engaged in any protected activity or that he was terminated as the result thereof.

#### 1.   *No evidence that Resendiz complained of sexual harassment*

The evidence indicates Resendiz complained generally about Herrera's treatment of him, but there is no evidence that the complaints involved allegations of sexual harassment.   In contrast, his interrogatory responses unequivocally state he did not make any complaints regarding sexual harassment.   For these reasons, we find there is no evidence that he complained of sexual harassment.

20

## 2. *No evidence that Resendiz complained of disability discrimination*

Resendiz testified that he was diagnosed with high blood pressure in either 2008 or 2010. However, he alleges that Herrera did not begin making comments to him about his high blood pressure until after he requested to take ten days off from work sometime in 2013, after he became dizzy and lost his balance at work due to his high blood pressure. And, although he initially alleged that this request was made in either March or August of 2013, the written documentation of his absence unequivocally establishes that his ten-day leave took place from October 28 to November 7, 2013.

But Resendiz provided no evidence that he complained to Carrillo or any other management personnel that he believed Herrera was mistreating him due to his alleged disability. In his response to the Center's interrogatories, Resendiz only alleged that he complained to Carrillo and human resources about Herrera's alleged "ongoing harassment" of him, not that Herrera was discriminating against him because of high blood pressure.[7] Moreover, his deposition testimony was similarly vague, with no indication that he made any specific complaints of disability discrimination to Carrillo or that he even informed her of his alleged disability. And although Carrillo recalled that Resendiz complained to him of Herrera's alleged mistreatment, she did not recall Resendiz telling her that he believed Herrera had a discriminatory motive for mistreating him, or that he mentioned his high blood pressure issues in his complaint.

We therefore conclude that Resendiz failed to establish that he reported any unlawful disability discrimination to Carrillo or anyone else at the Center.

---

[7] In his supplemental answers to the Department's interrogatories, Resendiz stated that he did not complain about Herrera's alleged sexual harassment because his "complaints regarding his disability were disregarded." However, this is the only reference Resendiz made to any such disability complaints, and he did not provide any indication of when or how these complaints were made or to whom they were made, nor does he elaborate on the content of the complaints in question. We therefore find this general reference to a disability complaint too vague to support his allegation that he reported his alleged disability to anyone at the Center.

### 3. *Resendiz's leave request did not constitute a protected activity*

Resendiz argues that his request for a ten-day absence from work can be considered a request for a reasonable accommodation under TCHRA, which in turn he contends can be considered a "protected activity." And Resendiz further contends that because he was terminated shortly after he made his leave request, this timing would allow a jury to reasonably infer that his termination came in retaliation for making his request. We disagree.

The Texas Supreme Court recently addressed a similar issue in *Lara*. In that case, a state employee who had suffered a catastrophic illness, exhausted his sick leave, and thereafter filed paperwork requesting benefits under the Family Medical Leave Act (FMLA), and the State's sick leave pool. 625 S.W.3d at 49. Over the course of approximately five months, at various times, the employee received paid leave through the sick leave pool, as well as unpaid leave under the FMLA. *Id.* In addition, during that time, the employee had multiple communications with his supervisors, making it clear that he was seeking leave to receive medical treatment for his condition, which would in turn, enable him to return to work within a specified period of time. *Id.* at 49-50. However, after he made his second request to extend his leave, his employer notified him that it was terminating him so that it could hire a full-time employee to perform his job duties. *Id.* at 49 Upon being terminated, the employee filed suit against the employer, arguing that his leave request could be considered a request for a "reasonable accommodation" under TCHRA, and that the employer had terminated him in retaliation for making the request, in violation of TCHRA's anti-retaliation provisions. *Id.* at 50.

As a preliminary matter, the court agreed with the employee that requesting leave without pay could constitute a request for a reasonable accommodation under TCHRA. *Id.* at 55. In particular, the court noted that a request for a reasonable accommodation need not be formal in

22

nature, need not mention discrimination laws, or use the term, "reasonable accommodation." *Id.* Instead, the court held that the employee was only required to "let the employer know that [the employee] needs an adjustment or change at work for a reason related to medical condition." *Id.* at 53. And the court concluded that by submitting evidence of his multiple leave requests and his communications with his supervisors regarding his medical condition and desire to return to work once his treatment was completed, he had raised a question of fact regarding whether his request for leave without pay constituted a request for a reasonable accommodation under TCHRA. *Id.* at 54.

However, the court concluded that the employee had not made out a prima facie case that he was terminated in *retaliation* for making that request. *Id.* at 59-60. The court expressly held that to invoke the anti-retaliation protections under TCHRA, the employee's request for an accommodation must alert the employer to his belief that "disability discrimination was at issue," or in other words, that the accommodation request was made to oppose a discriminatory practice of that nature. *Id.* at 59-60. The employee in *Lara* argued that his various leave requests, as well as his ongoing communications with his supervisors discussing his requests, alerted the employer that he was opposing a discriminatory practice based on his disability. *Id.* at 60. However, the court disagreed, pointing out that there was no evidence that the employee had alerted the employee "to the possibility of discrimination in any of these communications." *Id.* at 61.

We reach a similar conclusion in the present case. Resendiz did far less than the employee in *Lara* did in terms of letting the Center know that he needed an "adjustment or change at work for a reason related to medical condition." *Id*. at 53. As set forth above, Resendiz made a single request for a ten-day leave of absence, after he became dizzy and lost his balance at work due to his high blood pressure, and upon his return, he submitted a "return to work" note from his doctor,

23

as requested by the Center in accordance with its policies, stating that his absence had been necessary due to his high blood pressure. There is nothing in the record to suggest that Resendiz alerted the Center that he needed the time off work to obtain medical treatment for his condition that would allow him to continue performing his job, or that he had any other communications with the Center's management seeking an "adjustment or change" of his work schedule due to his condition. We therefore question whether his leave request could in fact be considered a request for a reasonable accommodation under TCHRA. *See Aldine Indep. Sch. Dist. v. Massey*, No. 01-17-00688-CV, 2018 WL 3117831, at *4 (Tex.App.--Houston [1st Dist.] June 26, 2018, no pet.) (recognizing that employee is responsible for initiating a request for a reasonable accommodation by pointing out his disability and requesting what he believes would constitute a reasonable accommodation that would allow him to continue performing his job); *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 620 (5th Cir. 2009) (explaining that it is employee's responsibility to inform employer that he seeks an accommodation and to explain that the accommodation requested is for a medical condition to allow the employee to continue performing his job).

Nevertheless, even if Resendiz's leave request could be considered a valid request for a reasonable accommodation under TCHRA, it cannot be considered "protected activity" under the TCHRA. As in *Lara*, there is no evidence in the record that Resendiz alerted the Center--either in the leave request itself or in any other communications he had with his supervisors-- that he was making the request as a means of opposing a discriminatory practice, or that he otherwise put the Center on notice that disability discrimination was "at issue." Therefore, as in *Lara*, there is nothing in the record to support a finding that Resendiz's leave request could be considered "protected activity" under the TCHRA.

### 4. *National origin discrimination*

Resendiz alleged in his EEOC complaint that in March of 2013, Herrera became "openly hostile" toward him because he did not speak English and began making "disparaging remarks" to him and other non-English speakers, such as, "Do you not have a brain? or "Can't you think?" when other people were present. He further alleged that he complained to "management that this treatment was not proper" but that nothing was done. He then specified later in his complaint that in "August 2013, [he] and other co-workers, complained to Zulema Carrillo, supervisor, regarding the treatment we were receiving from Josie Herrera," but that again, no action was taken. And he further alleged that he called to complain to human resources in Austin and was told he had to complain locally. He asserted, however, that he advised them he had already "talked to management locally and they didn't respond."

Resendiz provided little more information about his alleged complaints to management in either his answers to the Center's interrogatories or in his deposition testimony. In answer to the Center's interrogatory question in which he was asked to identify "each and every instance in which [he] complained about any kind of discrimination forming the basis of this lawsuit during [his] employment," Resendiz responded that he could not recall the dates on which he did so, but that he orally complained to Carrillo "about Josie Herrera's ongoing harassment." He further alleged that he called the "Austin office to complain and was referred back to the El Paso office."

Although making a verbal report of discrimination to an employer may qualify as engaging in protected activity, a plaintiff must present some evidence to establish that he did more than "merely complain[] to the employer about [his] treatment." *Esparza v. Univ. of Texas at El Paso*, 471 S.W.3d 903, 914 (Tex.App.--El Paso 2015, no pet.). At best, Resendiz's claim that Herrera called him a Mexican and scolded him and others at the Center in English when they only spoke

25

Spanish, could signal national origin discrimination. But as to these complaints, he fails to present sufficient evidence that they caused his termination.

### C. No Evidence of Causation

Even if we were to assume for purposes of this appeal that Resendiz came forward with sufficient circumstantial evidence to meet his burden of establishing a prima facie case of retaliation, as with the National Origin and disability discrimination claims, the record does not support a finding that he was terminated on that basis. Once an employer offers an ostensibly legitimate reason for its actions, the presumption of discrimination disappears, and the burden then shifts back to the employee to show that the employer's stated reason was a pretext for discrimination. *Quantum Chem. Corp.*, 47 S.W.3d at 477; *see also Madden*, 473 S.W.3d at 360.

Two causation standards are at play in retaliation claims, the more onerous when the employer has evidenced a non-discriminatory basis for the employment action:

> The causation standard for the *McDonnell Douglas* prima-facie-case element is not onerous and can be satisfied merely by proving close timing between the protected activity and the adverse action. However, if the employer provides evidence of a legitimate reason for the adverse action, under the federal standard, the employee must prove the adverse action would not have occurred "but for" the protected activity. The but-for causation standard is significantly more difficult to prove than prima facie causation.

*Alamo Heights*, 544 S.W.3d at 782 (footnotes omitted). The "but for" standard was recently reaffirmed in a retaliation case by the court in *Apache Corp. v. Davis*, 627 S.W.3d 324, 336-337 (Tex. 2021).

In *Alamo Heights*, the court identified a series of factors useful in analyzing the causal link:

> In evaluating but-for causation evidence in retaliation cases, we examine all of the circumstances, including temporal proximity between the protected activity and the adverse action, knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false.

544 S.W.3d at 790. And more recently in *Apache Corp. v. Davis*, the court emphasized that the "factors" are not a replacement for the "but for" causation standard. 627 S.W.3d at 336. Moreover, "[t]he factors may be more helpful in some cases and less in others. Some of the factors may actually be a distraction." *Id.* "More importantly, determining but-for causation cannot be a matter of weighing—or worse, counting—factors that may be helpful in analyzing circumstantial evidence in some situations." *Id.* at 337. Rather, our focus must be on whether "but for" the protected activity, the termination would not have occurred when it did.

Without restating all the evidence regarding the theft claim, we conclude that the Department came forward with a record demonstrating a non-discriminatory basis for the termination, and that Resendiz failed to raise a genuine issue of material fact on pretext. He necessarily fails to carry his burden on but for causation on the retaliation claim.

## VII. SEXUAL HARASSMENT

In Issue Four, the Department contends that the trial court erred in denying its plea to the jurisdiction with respect to Resendiz's claim of sexual harassment, contending that Resendiz did not present sufficient jurisdictional evidence to establish his claim. As explained below, we agree with the Department that Resendiz did not present any evidence to support a *quid pro quo* form of sexual harassment, but that he did come forward with sufficient evidence to support a claim of sexual harassment based on a hostile work environment.

### A. The Elements of a Sexual Harassment Claim

Sexual harassment is a form of sex-based discrimination that is prohibited under TCHRA. *See Alamo Heights*, 544 S.W.3d at 771; *see also B.C. v. Steak N Shake Operations, Inc.*, 512 S.W.3d 276, 279 (Tex. 2017). Sexual harassment claims generally take one of two forms: "(1) quid-pro-quo harassment, in which the harasser demands sexual favors as a condition for granting

27

employment or its benefits, or (2) harassment that creates a hostile or offensive work environment." *Alamo Heights*, 544 S.W.3d at 806; *Mayfield v. Tarrant Reg'l Water Dist.*, 467 S.W.3d 706, 712 (Tex.App.--El Paso 2015, no pet.). Here, Resendiz relies upon both theories to support his sexual harassment claim, and we therefore consider both in our analysis.

## B. No Evidence of *Quid Pro Quo* Sexual Harassment

To establish a prima facie case for *quid pro quo* sexual harassment, a plaintiff must show that: (1) he is a member of a protected group; (2) he was subjected to unwelcome sexual advances or requests for sexual favors by someone with actual or apparent authority; (3) the harassment was based on sex; and (4) submission to the unwelcome advances was an express or implied condition for receiving job benefits or refusal to submit resulted in a tangible job detriment. *Mayfield*, 467 S.W.3d at 712; *see also Alamo Heights*, 544 S.W.3d at 806 (recognizing that *quid pro quo* harassment requires a showing that the "harasser demands sexual favors as a condition for granting employment or its benefits."). Here, Resendiz testified to several incidents in which he believed that Herrera subjected him to unwanted sexual advances. Yet he never alleged that her advances were an express or implied condition for receiving job benefits or that his refusal to submit to the advances would result in a tangible job detriment. Nor did he provide any evidence of such. To the contrary, Resendiz testified at his deposition that Herrera never said that he was required to comply with her advances toward him to get a promotion or a raise. In addition, in his response to the Department's interrogatories, when asked to explain how Herrera's alleged sexual harassment affected "any term, condition or privilege" or his employment, Resendiz responded only that her treatment made him uncomfortable, and made it difficult for him to work. He did not, however, provide any evidence that Herrera required him to submit to the advances as a condition of his employment, or that she would threaten to take any negative action against him if

28

he did not submit to her advances. Accordingly, we agree with the Department that Resendiz failed to raise a question of fact on his claim for *quid pro quo* sexual harassment.

### C. Resendiz's Evidence of a Hostile Work Environment

We next consider whether Resendiz came forward with evidence to raise a factual question regarding whether Herrera's alleged sexual harassment created a hostile work environment. We conclude that he did.

#### 1. The elements of a hostile work environment claim

To make a prima facie showing of hostile environment sexual harassment based on a hostile work environment, the plaintiff must show (1) he was subjected to unwelcome sexual harassment, (2) he was harassed because of his sex, (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile work environment, and (4) some basis for holding the employer liable. *Alamo Heights*, 544 S.W.3d at 771. For an employer's conduct to rise to the level of a hostile work environment, it must be both objectively and subjectively hostile or abusive, or in other words, the work environment must be both one that a reasonable person would find hostile or abusive and one that the victim in fact perceived it to be. *See Texas Dep't of Aging and Disability Services v. Loya*, 491 S.W.3d 920, 926 (Tex.App.--El Paso 2016, no pet.) *citing Mayfield*, 467 S.W.3d at 712-13; *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). In assessing objective hostility or abusiveness, we consider the totality of the circumstances, including the frequency and severity of the alleged conduct, whether there were physical threats or humiliation, and whether the abusive conduct unreasonably interfered with the employee's work performance. *See Loya*, 491 S.W.3d at 926 *citing Harris*, 510 U.S. at 23. Although the plaintiff need not demonstrate that the conduct caused him a "tangible psychological injury," he must demonstrate that it was more than "merely offensive." *Mayfield*, 467 S.W.3d at

713 ("[a]busiveness requires extreme conduct, and takes a middle path between making actionable conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."); *see also Dillard Dep't Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 407 (Tex.App.--El Paso 2002, pet. denied) (tangible psychological injury such as a nervous breakdown is not required to support a harassment claim).

Once a court concludes that a plaintiff has met his burden of establishing a prima facie of sexual harassment based on a hostile work environment, there is no need to engage in a *McDonnell-Douglas* burden shifting analysis. *See, e.g.*, *Matthews v. Corning, Inc.*, 77 F.Supp.3d 275, 292 (W.D.N.Y. 2014) ("hostile work environment claims are not analyzed using the *McDonnell Douglas* three-part burden-shifting test"). Unlike situations in which a plaintiff has brought a discrimination claim over an adverse employment action, a plaintiff alleging a hostile work environment is complaining about the harassment itself and the damages that he suffered as the result of the harassment. *See Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 510-511 (11th Cir. 2000). And, as other courts have recognized, there "simply is no legitimate business justification for severe or pervasive sexual harassment," and therefore it would be illogical and unwarranted to go through the *McDonnell-Douglas* burden-shifting analysis in a hostile work environment case. *Lewis v. Forest Pharm., Inc.*, 217 F.Supp. 2d 638, 653 (D. Md. 2002).

### 2. *Resendiz's testimony supports a prima facie case of hostile work environment*

At his deposition, Resendiz testified to the following incidents involving Herrera that he found offensive: (1) Herrera kept her work keys "inside her breasts" and when she would take them out in front of him, she would say that the keys were "warm," and she would laugh about it; (2) Herrera told Resendiz that he was her boyfriend, and that other people were saying that he was

her boyfriend; (3) Herrera would on unspecified occasions turn around as she was going up stairs to "look at [his] private parts"; (4) on one occasion, Herrera made him pull down his pants to show him a scratch that he had suffered on his leg playing soccer when he complained that his injury was making it difficult for him to work; (5) Herrera touched him "many times," and when she touched his legs, she would complement him, saying such things, as "Man, you have good legs"; (6) when they were in her office behind closed doors, Herrera would on "many occasions" unbutton her blouse all the way down, "showing her breasts," and would "open her legs," showing him "everything." And in his response to the Department's interrogatories, Resendiz added that Herrera would on occasion "rub her chest on his shoulders," make "disrespectful comments about his buttocks and thighs," would laugh when "people thought they were together," and made comments that she and her husband could not have sex because of his kidney issues.

The Department contends that even if a jury believed Resendiz's testimony, it does not support a finding that Herrera's alleged conduct was so severe or pervasive that a reasonable person would have found it to be hostile or abusive. In support of its position, the Department cites to *Garcia v. Schwab*, 967 S.W.2d 883, 884, 887 (Tex.App.--Corpus Christi 1998, no pet.), contending that the employer's conduct in that case was a far worse example of sexual harassment, and that Herrera's alleged misconduct was merely offensive in comparison. The Department's reliance on *Garcia*, however, is misplaced. In that case, a male supervisor stared at and made comments about a female employee's breasts, remarked on her appearance, commented on the appearance of other women, touched his genitals in front of her, discussed personal sexual matters with her, made sexual references that she felt were intended to arouse her, and generally insulted and yelled at her. *Id.* at 887. As set forth above, Resendiz also alleged that Herrera inappropriately stared at his private parts, remarked on his anatomy, discussed sexual matters

31

involving her husband, and similarly insulted and demeaned him. However, he also alleged much worse conduct, claiming that Herrera repeatedly exposed herself to him and engaged in unwanted and suggestive touching. Here, Resendiz presents a triable issue of fact as to whether Herrera's conduct was severe, pervasive, and extreme in nature. *See Dillard Dep't Stores, Inc.*, 72 S.W.3d at 408 (jury could reasonably conclude that employee was subjected to a hostile work environment where employee testified that his immediate supervisor pressed up against him so that he could feel the supervisor's penis on "many occasions," offered to stick his tongue in the employee's mouth, and "stroked, rubbed and patted" employee in a caressing manner).

The Department also contends that even if Herrera's alleged conduct could be considered severe and extreme, Resendiz did not present sufficient evidence to establish that her conduct altered or interfered with his work performance. We disagree. Resendiz presented evidence that during his last year of work at the Center, Herrera's alleged harassment made his work "difficult," caused him stress, contributed to his high blood pressure, and caused him to miss work.[8] Unlike *quid pro quo* harassment, in which a plaintiff must demonstrate that an employer explicitly altered the terms, conditions or privileges of his employment, when a plaintiff proceeds on a theory of harassment culminating in a hostile work environment, it is the severe and extreme nature of the harassment itself that is said to "constructively alter the employee's terms or conditions of employment." *Waffle House, Inc.*, 313 S.W.3d at 806-07. We therefore find Resendiz's evidence in this regard to be sufficient to support his claim.

---

[8] The Department also complains that Resendiz "cannot properly self-diagnose himself with a medical condition or render an expert medical opinion as to causation for his hypertension." The record, however, contains Resendiz's doctor's note dated November 7, 2013, stating that Resendiz had been diagnosed with high blood pressure, and that his condition was "permanent." In addition, although Resendiz did not present any expert testimony to establish that his high blood pressure was caused by the stress of his work environment, the Department has not cited to any authority that he was required to do so at this stage of the proceedings.

And finally, the Department finds it significant that Resendiz did not complain to "management" at the Center that Herrera was harassing him, and the Department contends that there is therefore no basis for holding it liable. We disagree. In general, when a plaintiff seeks to hold an employer liable for harassment, there must be some evidence that the employer knew or should have known of the harassment, which can take the form of a complaint to management. However, when, as here, the employee claims that it was his supervisor that engaged in the alleged harassment, this is sufficient to support a finding that the employer was aware of the harassment, and the employee therefore need not present evidence that he filed any complaints about the supervisor's conduct. *See, e.g.*, *Nairn v. Killeen Indep. Sch. Dist.*, 366 S.W.3d 229, 245 (Tex.App.--El Paso 2012, no pet.); *see also Dillard Dep't Stores, Inc.*, 72 S.W.3d at 407-08 (when employee claims that his supervisor engaged in sexual harassment, employee need only show that the supervisor subjected him to unwelcome conduct because of sex, which was so severe and pervasive that it created an abusive work environment that affected a term, condition, or privilege of employment).

Accordingly, having found that Resendiz has presented sufficient evidence to support a prima facie case of sexual harassment based on a hostile work environment, we conclude that the trial court did not err in denying the Department's plea to the jurisdiction with respect to this claim.

The Department's Issue is therefore sustained in part, and overruled in part, as set forth above.

## VIII. CONCLUSION

We conclude that Resendiz failed to come forward to establish a prima facie case on his claims of gender and retaliation claims. He failed to create a genuine issue of material fact contesting the Department's stated non-discriminatory basis for terminating him, which negates

33

his national origin discrimination and disability discrimination claims, in addition to his gender and retaliation claim. The trial court erred in denying the Department's plea to the jurisdiction as to those claims. Further, we conclude that Resendiz did not come forward with a scintilla of evidence to support his claim of *quid pro quo* sexual harassment, and that the trial court therefore also erred in denying the Department's plea to the jurisdiction on that claim. However, we conclude that Resendiz did come forward with at least a scintilla of evidence to support his claim of sexual harassment based on a hostile work environment, and we therefore conclude that the trial court did not err in denying the Department's plea on that claim alone. Accordingly, we reverse the trial court's judgment in part and affirm in part, and we remand this matter to the trial court for further proceedings based solely on Resendiz's claim of hostile work environment.

JEFF ALLEY, Justice

November 29, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

34